**ROBBINS et al. v. HILL. (No. 2890.)**

(Court of Civil Appeals of Texas. Texarkana. Feb. 28, 1924.)

**1. Sales ⬉81(2), 83—Obligation to make total delivery of lumber within reasonable time from date of contract held implied.**

Where a contract to buy lumber obligated the buyer to furnish cars without specifying the time of total delivery, but the circumstances manifested an intention of the parties that total delivery would be completed within a reasonable time, the law implied that the cars were to be furnished and total delivery made within a reasonable time from the date of the contract.

**2. Sales ⬉88—What constituted reasonable time for buyer to furnish shipping orders held question of law.**

Under a contract requiring buyer of lumber to give shipping orders and to furnish cars to seller within a reasonable time from date of contract, the question what constituted a reasonable time within which to give shipping orders became a question of law, the facts being undisputed.

**3. Sales ⬉65—Giving of shipping orders and furnishing of cars by buyer and loading them by seller held concurrent terms of agreement.**

Where, under a contract of purchase of lumber, buyer was to furnish cars to seller, who was to load the lumber f. o. b. the cars at point of shipment, the buyer to furnish shipping orders within a reasonable time from date of contract, the giving of the shipping orders and furnishing of the cars by the buyer and the loading of the lumber f. o. b. the cars by seller were concurrent and interdependent terms of the agreement.

**4. Sales ⬉177, 384(7)—Buyer held to have breached agreement to give shipping orders for lumber within reasonable time; damages stated for buyer's breach.**

Buyer of lumber who was, under his contract, obligated to give final shipping order to seller within a reasonable time from date of contract, *held* to have breached his agreement where he did not give an order for the remaining lumber for over a year from the date of contract, so that, where the seller was forced to sell to another the undelivered portion at a loss because of depreciation of lumber he was entitled to the difference between the buyer's lowest contract price and the amount received by the seller from the sale.

**5. Sales ⬉71(3)—In buyer's contract to buy 390,000 feet "estimated," latter word meant more or less.**

Where a contract obligated buyer to take all lumber of the specific dimensions stated, of a certain grade, contained in the stacks on seller's mill yards, to the quantity of 390,000 feet "estimated," the latter word as used meant practically the same as "more or less."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Estimate.]

Appeal from District Court, Walker County; Carl T. Harper, Judge.

Action by J. C. Hill against Edgar Robbins and others, in which defendants set up a cross-action by way of plea in reconvention. Judgment for plaintiff, and defendants appeal. Judgment modified, and as so modified affirmed.

The suit is brought by the appellee in the nature of assumpsit to recover money had and received by appellants in alleged overpayment of the contract sale price of 280,512 feet of lumber delivered to him.

The appellants by their answer admit that they delivered to the appellee the 280,512 feet of lumber, that the sum of money stated was paid to them, and that it was the contract price therefor; but claim that by the terms of the contract relating thereto between the appellants and the appellee the latter obligated himself to take at a fixed price 390,000 feet of rough lumber of No. 2 grade or better, then stacked on the millyard of appellants near Huntsville, deliverable by appellants f. o. b. the cars at Huntsville within 60 days from the date of the contract on

---

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

shipping orders of appellee, and that appellee did not give shipping orders or call for or demand the lumber, except the 280,512 feet, within the time agreed upon, or within a reasonable time, though urged to give such orders, and therefore appellee is owing the appellants the balance of the contract price after deducting the amount paid and certain other alleged items of admitted credit to appellee. In this respect the cross-action of appellants particularly alleges:

"That it was understood between the plaintiff and the defendants that the plaintiff would present to the defendants shipping instructions covering the removal of all of said lumber within 60 days after September 2, 1920, and that the defendants would transport the said lumber to Huntsville, Texas, and load the same into the cars as might be provided under the plaintiff's instructions; that the plaintiff only ordered out five cars of the lumber during said period of time, to wit, on September 16, 23, 25, and 30, 1920; that, though the defendants urged the plaintiff to do so, he did not give shipping instructions for the balance of the lumber except as follows: On December 12, 1920, for one car, and in February, 1921, one car, in March, 1921, one car, and in May, 1921, one car—that during the fall and winter of 1920, and in the spring and the greater part of the summer of 1921, there were almost continuous rains, causing the lumber unshipped to deteriorate very greatly in value; that after the plaintiff had so allowed the lumber to deteriorate the defendants sold 48,000 feet of it to E. T. Ernest as No. 3 rough lumber at $8 per thousand feet, and the defendants do now here charge themselves and credit plaintiff with the price received of $384."

The amount sought to be recovered is $1,479.29.

The case was tried before the court without a jury, and, in keeping with the court's findings of fact, judgment was entered for the appellee and against appellants on their cross-action.

The following are the findings of fact and conclusion of law filed by the trial judge, viz.:

"(1) I find it to be an admitted fact that the plaintiff and defendants entered into a contract for the sale of 390,000 feet of lumber.

"(2) I find that the defendants only delivered to plaintiff 280,500 feet of lumber under said contract.

"(3) I find that the contract price for said 280,500 feet of lumber was $7,519.

"(4) I find that the plaintiff paid to the defendants $7,754.71. I therefore find that plaintiff paid the defendants $235.71 more than the contract price of the lumber actually delivered by the defendants to the plaintiffs.

"(5) I find that the plaintiff and defendants had agreed upon 50 cents per thousand feet for trimming said lumber, and therefore find the defendants were due plaintiff $140.25 for this item.

"(6) I find that some of the lumber shipped by defendants to plaintiff was not up to the grade of lumber described in the contract, and that plaintiff called this matter to the attention of the defendants, and they instructed the plaintiff to make the best disposition of it he could; and I further find, in this connection, that the plaintiff lost $176.50 by reason of said amount of lumber being below the grade mentioned in the contract.

"(7) I find against the defendants on their plea in reconvention.

## "Conclusions of Law.

"I therefore conclude, as a matter of law, that the plaintiff is entitled to a judgment against the defendants jointly and severally in the sum of $555.46."

J. C. Hill was engaged in the business of buying and selling lumber, under the trade name of J. C. Hill Lumber Company, at Houston. Alexander and Robbins operated a sawmill four miles from Huntsville, and had sawed, and in August, 1920, there was on the millyard, separately stacked, rough manufactured lumber of the estimated amount of 390,000 feet, consisting of pieces of 1x12, 1x10, 1x8, 1x6, 1x4, 2x4, and 2x6. In August, 1920, appellants made a check list of the lumber, and, desirous of selling it, went to Houston for the purpose of effecting a sale.

Respecting the agreement between the parties the evidence pertinent to be stated is as follows:

The appellant Cleve Robbins testified:

"I am a member of the firm of Alexander and Robbins. I made a contract to sell the lumber that Alexander and Robbins had on hand the latter part of August, 1920. I made a contract with S. W. Jones for Mr. Hill. I sold him No. 2 and better rough lumber then on the yard at the prices stated in that memoranda (referring to a memorandum attached to plaintiff's petition). I went down to Houston on the 2d of September. I had a check list of the lumber. I went to see several lumber men. I went into Mr. Hill's office and saw Mr. Jones and showed him what I had. He offered me the prices that are in that memorandum, and asked me if they took the lumber would we load it on the cars. I told him that I thought we could load it. He said he did not think it would be over 40 or 60 days before they would want it moved. I did not agree to sell until I could go back home and talk to my father and Mr. Alexander about it. I came back home and we decided to take it [the prices] and I called him over the telephone. We agreed in that conversation to sell on the prices named. Mr. Jones agreed that they would move it in 60 days. He was acting for Mr. Hill. I agreed that we would do everything that we could with reference to loading it."

The witness S. W. Jones testified:

"In September, 1920, I was employed by the J. C. Hill Lumber Company as sales manager, and general manager of the business in buying. I had authority to buy lumber for them. As agent and employee of the J. C. Hill Lumber Company I bought from them an amount of

lumber. I made the trade with Mr. Cleve Robbins, in the office of the J. C. Hill Lumber Company in Houston. At the time I did not make any estimate of the amount of the lumber he had, nor had I seen any of the lumber represented by him as being there. He represented to me that he had 390,000 feet, and that it was at the mill of Alexander and Robbins, four miles west of Huntsville. They did not make a written contract, nor one subsequent to the oral agreement. I agreed verbally at that time with Mr. Robbins for Alexander and Robbins to take the lumber as described therein [in the check list] of the sizes, lengths, and dimensions, at the price therein stated and reflected in that order. * * * We did not buy any No. 3 lumber from them, and they were not to ship out any No. 3 to us."

Mr. J. C. Hill testified:

"Yes, it is true that on September 2, 1920, I bought from the defendants, on their estimate, 390,000 feet of lumber. They delivered to me only 280,000 feet. I have paid them for the lumber they shipped to me. I went up there to the mill, about December 1, 1920; they wrote me or phoned me. I went out to the mill and I looked over practically all of the lumber. I got up on two or three stacks. One stack of 1x12 had kinder keeled over, and I told them I believed the lumber would damage unless they restacked it. I told them to put it over right across a little roadway and that I believed the lumber would get all right, just the same as the rest of it. I walked around and looked over the lumber. The balance of the lumber, except that one stack, seemed to be in mighty good condition. It looked to be nice lumber. * * * Mr. Jones bought the lumber. I saw the transaction and knew all about it. I expected them to leave it there and haul it to the railroad as we ordered it out. Under the contract they did not have any right to haul it there until we put the cars there to load it in. * * * There was no understanding between us with reference to the time when the lumber was to be moved. There was no date set."

The prices agreed upon were:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1x12 to 22, No. 2 and better, rough | | | | | | | $30 00 |
| 1x10 " " " " " " " | | | | | | | 28 50 |
| 1x8 " " " " " " " | | | | | | | 28 50 |
| 1x6 " " " " " " " | | | | | | | 28 50 |
| 1x4 " " " " " " " | | | | | | | 21 00 |
| 2x4 " " " " " " " | | | | | | | 25 00 |
| 2x6 " " " " " " " | | | | | | | 20 00 |

The appellee ordered out and the appellants loaded for shipment the following cars of lumber: One car each on September 16, 18, 23, 25, and 30, November 27, 1920, and February 26, March 2, 4, 8, and 15, and May 10, and October 6, 7, 8, and 29, 1921. Some of this lumber shipped out was below the grade of "No. 2 or better" to the amount of the deduction as found by the trial court of $176.50. The further deduction of $140.25 for "trimming," due to faulty sawing, is allowable, as found by the court, by agreement.

It appears undisputed that in 1920 and 1921 there was an unusual rainfall, and that in consequence the lumber on the mill yard began to damage in the summer and fall of 1921. The appellant Cleve Robbins testified:

"We had a lot of rain from December 1 on until spring and through the summer of 1921. As to the effect that would have on this lumber, it was stacked, and when it got wet it never got dried during all that time. That caused some of it to deteriorate from No. 2 down to No. 3 and No. 4. Some little of it rotted through. I shipped out this lumber in February, March, and April, and through the spring, we tried not to put in the cars any lumber that would class lower than No. 2. That was from February on. We sold to Mr. Ernest some of that weather-damaged lumber, 48,000 or 50,000, that came out of the stacks of the 390,000 feet that we sold Mr. Hill. Between 6,000 and 8,000 feet of that 48,000 feet that we sold Mr. Ernest was No. 3 when it was manufactured. It would not go about 8,000 feet. The balance over that 48,000 feet went down from No. 2 to No. 3 because it had stayed there in the stacks so long after it commenced raining that it began to show rotten."

It was shown that appellants received no shipping instructions except as previously stated above. The appellee Hill said:

"Yes, sir; they were urging us all the time to give them shipping instructions. Yes, sir; all that remained to be done on their part was for me to give shipping instructions. On December 1 I told them it would be two or three months, or possibly longer, before I could do that; there was no date set. They shipped cars in February and March, five. Then there was no more shipped until October."

Edgar Robbins testified:

"We kept our teams for the purpose of delivering that lumber from December on up until May, and it cost us $6 per day to feed them. We held the teams during all that time to move the lumber. Mr. Hill promised us that he would move it as fast as possible. We got no shipping orders except for February and March and one in May. Then we got no further instructions until late in September. We then after that had to take our teams and try to make a living. We were not able to keep our teams there and pay for help to further load that lumber. We quit staying there about November 1st."

Dean & Humphrey, of Huntsville, for appellants.

M. E. Gates, of Huntsville, for appellee.

LEVY, J. (after stating the facts as above). Error is predicated upon the court's finding "against the defendants on their plea in reconvention." Practically the only questions at issue between the parties are involved in the plea in reconventions; and clearly we think, under the pleading and evidence, the appellants are entitled to a judgment in their favor as an offset to the appellee's judgment. It is conclusively shown that the appellants and the appellee made an

oral contract on September 2, 1920, by which the appellants agreed to sell and appellee agreed to buy at expressly stated prices all the rough lumber of the dimensions expressly stated, of the grade of "No. 2 or better," then piled in stacks on the millyard, estimated to aggregate 390,000 feet, deliverable by appellants f. o. b. railway cars at Huntsville, under shipping orders to be given by appellee. The evidence is undisputed that the appellee, the buyer, was to secure and furnish through the railway company the necessary cars. The time of total delivery was stipulated in the agreement, as appellants' evidence goes to show, at within 60 days from the date of the contract. But appellee's evidence is to the effect that no date was fixed for the total delivery.

[1-5] In view of this conflict of evidence it must be assumed as a fact, as involved in the court's findings, that no specific time of total delivery was stipulated in the oral contract. The circumstances, though, manifest the intention of the parties that the total delivery would be completed within a reasonable time. The shipments actually began to be made in September, and continued rather regularly for about 60 days. Hence the law would imply that the parties provided that cars were to be furnished and total delivery was to be made within a reasonable time from the date of the contract. By its terms the contract so made was entire, and not severable, having the legal effect of obligating the appellee to take all the lumber of the specific dimensions stated of the grade of "No. 2 or better" contained in the stacks on the mill yard, to the quantity of 390,000 feet "estimated." "Estimated," as used, is practically the same as "more or less." The appellants were legally obligated by the contract to deliver f. o. b. the cars all that quality and quantity of lumber in the stacks. If the appellants in performing the contract shipped lumber containing any below the grade of "No. 2 or better," the appellee would be entitled to reject the same, or make claim for the difference in value. But, since the agreement shows clearly that the provision was f. o. b. the cars at point of shipment, and that such provision was so used to designate the place at which delivery was to be consummated, the title to the lumber did not pass to appellee before and until the lumber was placed on the cars for shipment. Then the care of the lumber while on the yard awaiting shipment devolved upon the appellants, until at least for a reasonable time after the date of the contract until the total shipment could be completed.

Therefore, in order for the appellants to recover for the damaged lumber in evidence, not placed on the cars for shipment, it devolved upon them to show that a failure to make total delivery within a reasonable time was not due to their fault. This we think they have conclusively shown by the evidence. The appellee was to give all the shipping orders within a reasonable time from the date of the contract, and this he did not do. It was more than a year after the date of the contract that as much as 48,000 feet was there on the mill yard. No shipping order for it had been received, and proper demand had frequently been made of appellee for shipping orders to complete a total delivery. It was after this failure to give such shipping orders that the appellants, to prevent further damage and deterioration, in November, 1921, sold the 48,000 feet to Mr. Ernest. What is a reasonable time within which to give the shipping orders, when the facts are undisputed, becomes a matter of law, especially under the facts in this record. Having provided, as the law implies, that the shipping orders would be given within a reasonable time, the appellee was legally required to do so. The giving of the orders and furnishing the cars by the appellee, and the loading of the lumber f. o. b. the cars by the appellants, were concurrent and interdependent terms of agreement, and the doing of the things required of each party was the consideration therefor. It follows that appellants would be entitled to recover some amount on their plea in reconvention, since it is undisputed in the evidence that appellee breached the agreement to give final shipping orders within a reasonable time. What amount? It is conclusively shown that as much as 48,000 feet of the lumber was undelivered and sold to Mr. Ernest. Of the 48,000 feet sold to Mr. Ernest there was, it appears, 8,000 feet of a grade originally below No. 2, leaving 40,000 feet in the first instance of No. 2 grade. 40,000 feet at the lowest contract price of $20 per thousand would be $800, and deducting the $384 obtained from the sale would leave $416, which amount appellants should have judgment for.

The judgment of the district court is therefore modified so as to allow appellants judgment on their plea in reconvention in the sum of $416, and the same to be a set-off to that amount with the interest thereon from this date, against appellants' judgment. The judgment as so modified will be in all things affirmed; the appellee to pay costs of appeal.